465 So.2d 925 (1985)
Jack C. TOLER, Jr., et al, Plaintiffs-Appellees,
v.
PACIFIC INTERNATIONAL PETROLEUM, INC., et al, Defendants-Appellants.
No. 16825-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 1985.
Rehearing Denied March 27, 1985.
Writ Denied May 24, 1985.
Gary, Field, Landry & Dornier by Davis B. Allgood, Baton Rouge, for plaintiffs-appellees.
Simon, Peragine, Smith & Redfearn by Robert L. Redfearn, John C. Herbert & Judy Perry Martinez, New Orleans, for defendants-appellants.
Before MARVIN, JASPER E. JONES and NORRIS, JJ.
JASPER E. JONES, Judge.
Pacific International Petroleum (PIP) appeals a summary judgment ordering it to pay the plaintiffs, Jack C. Toler, Jr. and Marie E. Morvant Toler, a bonus of $117,500.00 due for a mineral lease plaintiffs granted PIP. We amend and affirm.
The facts are uncontested. On March 21, 1978 Mrs. Toler granted a mineral lease covering three tracts of land in East Baton Rouge Parish containing a total of 47 acres *926 to Robert Salsman, Jr. The lease carried a five year primary term.
During the summer of 1981 Robert McKellar, in his capacity as PIP's agent, was buying for PIP mineral leases in the Tuscaloosa Trend in the Baton Rouge area. While in the area he contacted the Tolers seeking to secure a top lease covering the land subject to the Salsman lease. After negotiating with McKellar the Tolers granted PIP the top lease on October 20, 1981. The lease provided for a five year primary term from March 21, 1983 which was the date the primary term of the Salsman lease would expire. As consideration for the top lease PIP paid the Tolers a $23,500.00 bonus.
PIP and the Tolers signed a side agreement on October 20, 1981 supplementing the lease, in which PIP recognized the existence of the Salsman lease. The side agreement provided PIP would pay the Tolers an additional bonus of $117,500.00, "upon approval of title, but not later than ten (10) days from March 21, 1983." The clear implication of this provision is that PIP would pay the additional bonus if the Salsman lease expired at the end of its primary term and if the Tolers' title to the leased property was otherwise approved. The same day the lease and side agreement were executed PIP issued the Tolers a draft for $117,500.00. The draft contains the language, "upon approval of title but not longer than 10 days after March 21, 1983."
The Salsman lease expired at the end of its primary term on March 21, 1983. When the Tolers presented the $117,500.00 draft for payment they were informed, without explanation as to why, that PIP had instructed its bank to dishonor the draft. A written demand for payment was subsequently sent to PIP by the Tolers' attorney. PIP refused to pay and the Tolers filed suit. By way of discovery the Tolers learned that PIP's reason for dishonoring the draft was that its attorney, Jerry Bunch, refused to approve title. Bunch refused to approve title because the three tracts of land covered by the lease were encumbered by a prior recorded collateral mortgage in the face amount of $55,000.00 which the Tolers executed in 1977.
The trial judge did not assign reasons for judgment. It is obvious, however, he found there was no genuine issue of material fact and the existence of the collateral mortgage did not provide legal justification for the disapproval of the Tolers' title.[1]
PIP argues the summary judgment was erroneously granted because of the existence of a factual issue as to whether it intended, by including the phrase "upon approval of title" in the side agreement and on the draft, for approval to be by its attorney.[2] PIP argues this issue is material because if the intended meaning of the phrase was for approval to be by its attorney, the trial judge erred in deciding that the existence of the collateral mortgage did not provide legal justification for disapproval of title. Citing Hardtner v. Dixie Oil Co., 163 La. 1011, 113 So. 357 (1927) for authority, PIP contends that when the agreement between the parties provides for approval of title by a specific person, the only relevant inquiry is whether that person approved or disapproved title. PIP contends it is irrelevant and immaterial to consider whether the disapproval was arbitrary or for just cause.
The Tolers contend the trial judge correctly decided the case on the issue of whether the existence of the collateral mortgage provided legal justification for disapproval of title. They cite a line of cases in which the courts interpreted provisions in agreements to purchase immovable property giving the purchaser the right to *927 approve title as meaning the purchaser cannot arbitrarily reject title. Girault v. Feucht, 117 La. 276, 41 So. 572 (1906); Whited & Wheless v. Calhoun, 122 La. 100, 47 So. 415 (1908); Arkansas Fuel Oil Corporation v. Maggio, 141 So.2d 516 (La. App. 4th Cir.1962). The case of Hardtner v. Dixie Oil Co. held the defendant was justified in rejecting the title because it was defective. The holding is not contrary to the authorities relied upon by the plaintiffs. The dicta in the opinion stated a contract could only be construed to justify an arbitrary rejection of the title if the contract contains clear and unequivocal language requiring that result. The court stated: "It is our opinion that an arbitrary disapproval of a perfectly valid title is rarely within the contemplation of the contracting parties, and, to thus interpret a contract, the instrument must be so clear and unequivocal as to leave no room for doubt."
The provision on the draft and in the side agreement simply provides for "approval of title" which is similar to the provisions construed in the cases relied upon by the plaintiffs. There is no indication on the draft or in the side agreement that could be construed to give PIP or its attorney the arbitrary right to reject the title. PIP's contention that there exists a factual issue based upon the interpretation of "upon approval of title" has no merit, and Hardtner v. Dixie Oil Co. does not support its contention.
A transfer of mineral rights is subject to the rules governing the transfer of immovable property. LSA-R.S. 31:2, 16 and 18;[3]Guy Scroggins, Inc. v. Emerald Exploration, 401 So.2d 680 (La.App. 3d Cir.1981). In transfers of immovable property the law imposes upon the transferor the obligation of warranting merchantable title. See LSA-C.C. art. 2501.[4] Although the transferee is not required to accept an unmerchantable title, it is not every defect which renders a title unmerchantable. A transferee cannot arbitrarily reject title without a substantial reason and in the absence of such a reason he will be compelled to accept title. Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963); Pesson Plumbing and Heating Company v. Hammonds, 160 So.2d 769 (La.App. 3d Cir. 1964); Dorvin-Huddleston Developments, Inc. v. Connolly, 298 So.2d 734 (La.1974); Langford Land Co. v. Dietzgen Corp., 352 So.2d 386 (La.App. 4th Cir.1977). This is true even though the transferee's attorney questions certain aspects of the title and advises against the transfer. Pesson Plumbing and Heating Company v. Hammonds, supra; Langford Land Co. v. Dietzgen Corp., supra; White v. Batson, 317 So.2d 205 (La.App. 1st Cir.1975).
The inclusion in a transfer agreement of a provision giving the transferee the right to approve title is nothing more than recognition by the parties of the warranty imposed by law. We conclude the *928 trial judge correctly decided the case on the issue of whether the existence of the collateral mortgage provided legal justification for disapproval of the Tolers' title. PIP argues the trial judge erred in finding the existence of the collateral mortgage did not create a defect in title justifying PIP's rejection of the title.
The existence of a mortgage on property does not provide legal justification for refusing to accept title where the price agreed to be paid for the property is more than sufficient to satisfy the mortgage debt. Jaenke v. Taylor, 160 La. 109, 106 So. 711 (1925); Beatrous v. Dies, 167 La. 665, 120 So. 44 (1928); Lomel Realty Corporation v. Chopin, 177 La. 474, 148 So. 683 (1933). These cases held that the purchaser has the right to withhold from the purchase price an amount sufficient to discharge the mortgage. The affidavit filed by plaintiffs supporting their motion for summary judgment reflects the plaintiffs owe $18,354.46 on the hand note which is secured by the $55,000.00 collateral mortgage note.[5] The amount due on the draft is far more than enough to pay off the debt secured by the collateral mortgage note. The payment of the hand note would release the collateral mortgage note so the collateral mortgage could be canceled from the records.
PIP argues the right to pay off the existing debt provides it with inadequate protection. Since the mortgage is a collateral mortgage PIP claims it would be possible for the Tolers to borrow additional sums upon the collateral mortgage, subsequent to the current debt being paid off, which would be secured retroactive to the date the mortgage note was pledged and would, therefore, prime its lease. See New Orleans Silversmiths, Inc. v. Toups, 261 So.2d 252 (La.App. 4th Cir.1972); Mardis v. Hollanger, 426 So.2d 392 (La.App. 2d Cir. 1983). While the law relied on by PIP is correct, its argument ignores the fact that after paying off the debt secured by the collateral mortgage note the collateral mortgage note could be secured from the creditor and the collateral mortgage canceled. Plaintiff's affidavit states they have at all times been willing, upon PIP's request, to "pay off the mortgage."
The collateral mortgage could therefore have been canceled at the time the draft was paid and under these circumstances the existence of the collateral mortgage did not justify PIP's rejection of plaintiffs' title.
The judgment of the trial court does not recognize PIP's rights to withhold from the bonus an amount sufficient to pay off the debt secured by the collateral mortgage and demand a release of that mortgage. We, therefore, amend the judgment to add the following provision:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Pacific International Petroleum may, at its option, withhold from the $117,500.00 an amount sufficient to pay off the debt secured by the collateral mortgage, provided that the amount withheld be used to extinguish the debt, and to demand that plaintiffs' simultaneously secure from the creditor the collateral mortgage note and with it cancel the mortgage from the mortgage records of East Baton Rouge Parish.
As amended the summary judgment is AFFIRMED. All costs are assessed to PIP.
NOTES
[1] LSA-C.C.P. art. 966 B provides that a summary judgment shall be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law."
[2] The issue is allegedly raised by McKeller's deposition in which he stated that by including the phrase "upon approval of title" he meant for approval to be by PIP's attorney.
[3] § 2. Relation to Civil Code

The provisions of this Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law. In the event of conflict between the provisions of this Code and those of the Civil Code or other laws the provisions of this Code shall prevail. If this Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable.
§ 16. Basic mineral rights; status as real rights
The basic mineral rights that may be created by a landowner are the mineral servitude, the mineral royalty, and the mineral lease. This enumeration does not exclude the creation of other mineral rights by a landowner. Mineral rights are real rights and are subject either to the prescription of nonuse for ten years or to special rules of law governing the term of their existence.
§ 18. Nature of mineral rights
A mineral right is an incorporeal immovable. It is alienable and heritable. The situs of a mineral right is the parish or parishes in which the land burdened is located. All sales, contracts, and judgments affecting mineral rights are subject to the laws of registry.
[4] Art. 2051. Implied warranty against eviction

Although at the time of the sale no stipulations have been made respecting the warranty, the seller is obliged, of course, to warrant the buyer against the eviction suffered by him from the totality or part of the thing sold, and against the charges claimed on such thing, which were not declared at the time of the sale.
[5] In an affidavit submitted to the trial court for consideration with the motion for summary judgment Mr. Toler stated that on October 20, 1981, the day the top lease was granted to PIP, the actual debt secured by the collateral mortgage was $23,245.02. On March 21, 1983, the day the top lease was to go into effect, the actual debt secured was $18,384.56.